Filed 11/4/14  P. v. Gray CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C074022 |
| Plaintiff and Respondent, | (Super. Ct. No. 11F03854) |
| v. | |
| OLIVER GRAY, | |
| Defendant and Appellant. | |

A jury found defendant Oliver Gray guilty of five counts of robbery and found that he had personally used a firearm in committing the crimes, and defendant pled no contest to being a felon in possession of a firearm.  After finding that defendant had a strike prior, the trial court sentenced him to an aggregate term of 30 years and four months in prison.

On appeal, defendant contends the trial court erred in failing to suspend proceedings and appoint the director of the regional center for the developmentally disabled to examine him to determine his competence to stand trial.  Defendant also

1

contends the trial court erred in failing to conduct an inquiry when the jury foreperson complained during deliberations that one of the jurors appeared to be unable to comprehend the reasonable doubt instruction. We find no error and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

We omit a recitation of the underlying facts, as they are immaterial to our resolution of defendant's appeal. For our purposes, it is sufficient to say that in May 2011, defendant was charged with robbery and a number of other offenses stemming from an incident two days earlier. At a hearing near the end of June 2011, defense counsel expressed a doubt as to defendant's competence, and the trial court (Judge Marjorie Koller) immediately suspended the proceedings and ordered that defendant be examined.

Dr. Charles B. Schaffer, a psychiatrist and diplomate with the American Board of Psychiatry and Neurology, conducted a psychiatric evaluation of defendant and produced a report dated July 20, 2011. Dr. Schaffer concluded that defendant had the ability to understand the proceedings and to assist his counsel in a rational manner. Initially, defense counsel requested a trial on the issue of defendant's competency. Subsequently, however, the matter was referred back to Dr. Schaffer for a further evaluation,[1] and he produced a supplemental report dated October 3, 2011, in which he once again concluded that defendant had the ability to understand the proceedings and to assist his counsel in a rational manner. Two days later, on October 5, the parties submitted the matter based on Dr. Schaffer's supplemental report, and the court found defendant competent and reinstated the criminal proceedings.

---

[1] Apparently the matter was referred back to Dr. Schaffer at defense counsel's request based on defendant's "limited cooperation during the initial evaluation and additional information from counsel and defendant's family."

In April 2012, defendant filed a *Faretta*[2] motion. The court (Judge John Winn) appointed Dr. Paul G. Mattiuzzi to determine if defendant was competent to represent himself. Dr. Mattiuzzi examined defendant in May and concluded that defendant was not competent to represent himself. At a hearing in June, the parties submitted on Dr. Mattiuzzi's report, and the court denied the *Faretta* motion.

Meanwhile, in preparation for trial, defense counsel arranged for a comprehensive neuropsychological evaluation of defendant by Dr. John J. Wicks, a forensic neuropsychologist. Dr. Wicks conducted his evaluation over three days in April and May 2012 and produced a report dated July 16, 2012. Based on that report, defense counsel decided to have a PET scan conducted on defendant's brain to determine if any organic neurological defect could be detected. In August 2012, the parties agreed to continue the trial to September to allow defense counsel to obtain the scan. In September, defense counsel moved for a further continuance because she needed a psychiatrist or neurologist to order the scan and had not yet been able to get the order. Consequently, the court continued the trial again, ultimately setting a trial date in January 2013.

A week before the scheduled trial date of January 17, 2013, defense counsel put the case on calendar so that she could again express a doubt about defendant's competence. This time, defense counsel informed the court that she believed defendant had a developmental "deficiency under [Penal Code section ] 1368." She stated that the brain scan was completed in November, and based on her conversations with the neuropsychiatrist who ordered the scan (Dr. Albert Globus), as well as review of the radiologist's report of the scan, there were "confirmed areas of . . . brain damage consistent . . . with Dr. Wicks' earlier report which was based on family history, on educational records, [and] juvenile probation reports of Mr. Gray dating back to when he

---

**2**     *Faretta v. California* (1975) 422 U.S. 806 [45 L.Ed.2d 562].

3

was eight years old." Defense counsel contended the scan results were "a hard science confirmation and validation of Dr. Wicks' neuro psych evaluation . . . ." She sought a referral for further examination by "psychologists [who are] available who can focus on developmental disabilities and focus more on his abilities and lack of abilities . . . ."

In opposition to the request for another competency hearing, the People argued that Dr. Wicks's report did not justify a further competency hearing because it did not disclose a substantial change of circumstances or new evidence casting serious doubt on the validity of the prior finding of competence.

The court stated that while both attorneys were "spending a lot of time on Dr. Wicks' report," that report had never been submitted to the court. Defense counsel provided a copy of the report to the court, and the court reviewed the report before calling the matter again later that afternoon. After both attorneys submitted without offering further evidence, the court explained that it was a "difficult case" because the competency issue was considered earlier based on whether defendant "ha[d] a mental illness that require[d] psychiatric treatment and medication," while "[t]he issue now is whether or not it's a type of developmental disability." Noting again that it was "a close case," the court concluded as follows: "[W]hen I review it all, I think my thought is that based upon everything I've seen, I think Mr. Gray is at this point competent to stand trial. So I'm not going to suspend proceedings again. I've had some interaction with Mr. Gray directly because at one point he wanted to represent himself. Actually, if it wasn't for the fact that we suspended proceedings, I would have never appointed a doctor probably to meet with Mr. Gray. You know, even though it's a close case, I do feel that at this point he is able to assist counsel and able to understand the nature of the proceedings. So I am going to deny the request to suspend criminal proceedings at this point."

The case was tried to a jury in February 2013. On the third day of jury deliberations, the jury foreperson asked to speak to the court (Judge Michael Kenny).

4

After the court warned the foreperson not to say anything about the jury's deliberations, the foreperson told the court the following:

"My concern is with what a juror's literacy level is. We have a juror who I do not believe has the comprehension to be able to read the instructions as given to her. I'm concerned, because we have tried to explain in different modes and modalities. I teach special needs students, and I have tried numerous ways to see if we can get her to comprehend what 'reasonable' means and what 'beyond a reasonable doubt' means, and it's been stalling us." The court then ascertained from the foreperson that the juror at issue was participating in deliberations and while the foreperson believed the juror had "limited literacy," the other jurors had read the instructions "out loud to her," "but it did not seem to help."

The court then allowed the attorneys to ask questions, and the prosecutor asked whether the juror appeared to understand the instructions; the foreperson said it did not appear so. The court prohibited the foreperson from explaining the basis of her conclusion that the juror did not understand the instructions, however, because "[t]hat is going into deliberations." The foreperson then reiterated that multiple people had read the instructions, the instructions had been read slowly, and they "[e]ven had [the juror] track with her finger along with the text."

The court told the foreperson, "it sounds like you are doing everything that the Court would request you to do," and "individuals have varying interpretations at times, based on the facts as they have determined them through the process of the trial." Accordingly, the court directed the foreperson to return and continue deliberating.

Outside the presence of the foreperson, the prosecutor argued that the problem appeared to be more than a difference of opinion; "[i]t sounds like the juror does not understand the instruction itself, or the juror cannot understand the instructions." The court disagreed, stating that "it all boils around what is reasonable and what is not reasonable. And it sounds like substantial jurors have reached a determination of facts of

5

what is reasonable, and that this juror does not believe that, in fact, that interpretation is reasonable." The prosecutor proposed that the court ask the juror if she understood the instructions as they were read to her without asking her about her opinion, but the court declined to do so because the court understood "that there was a difference [of opinion] with regard to -- as to what reasonable doubt is." Ultimately, the court decided to "wait and see." That afternoon, without further incident, the jury returned its verdict.

DISCUSSION

I

*Defendant's Competence*

Defendant first contends that the trial court erred in failing to suspend the criminal proceedings and appoint the director of the regional center for the developmentally disabled to examine him in January 2013 because Dr. Wicks's report and the PET scan findings constituted substantial evidence that he was not competent to stand trial because he was suffering from a developmental disability. We disagree.

Penal Code "[s]ection 1367, subdivision (a) states that a 'defendant is mentally incompetent . . . if, as a result of mental disorder or developmental disability, [he] is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner.' ' "When the accused presents substantial evidence of incompetence, due process requires that the trial court conduct a full competency hearing. [Citation.] Evidence is 'substantial' if it raises a reasonable doubt about the defendant's competence to stand trial." ' " (*People v. Weaver* (2001) 26 Cal.4th 876, 953.)

*A different rule applies*, however, after the trial court has found the defendant to be competent and the issue of his or her competency is being raised for a second time. " 'Once a defendant has been found competent to stand trial, a second competency hearing is required only if the evidence discloses a substantial change of circumstances or

6

new evidence is presented casting serious doubt on the validity of the prior finding of the defendant's competence.' " (*People v. Weaver*, *supra*, 26 Cal.4th at p. 954.)

Defendant fails to argue his case in light of the foregoing rule and instead insists on arguing the substantial evidence test that applies to an *initial* determination of a defendant's competency.[3] To justify this approach, defendant contends that "two related but different procedures" apply in this context depending upon whether the defendant is suspected to be incompetent to stand trial because of a mental disorder or because of a developmental disability. According to defendant, "[i]n the typical case, where the question is whether a defendant is incompetent due to a psychiatric illness or mental disorder, 'the court shall appoint a psychiatrist or a licensed psychologist, and any other expert the court shall deem appropriate, to examine the defendant.' [Citation.] However, if it is suspected that the defendant is incompetent and suffers from a developmental disability, such as a neurological disorder, the court *must* 'appoint the director of the regional center for the developmentally disabled . . . to examine the defendant.' " (Fn. omitted.) In defendant's view, because "Dr. Wicks' report presented *new* evidence of a neurological impairment akin to intellectual disability based on multiple testing corroborated by [defendant's] PET scan, as opposed to any mental disease or illness that had previously been evaluated by Dr. Schaffer [citation], the trial court was duty-bound to refer [defendant] to the regional center . . . ."

Defendant is mistaken. The duty of the trial court to declare a doubt as to the defendant's competency, suspend proceedings, and conduct a full-blown competency hearing arises "[w]hen defense counsel has presented [or the court otherwise becomes aware of ] substantial evidence that a defendant is incompetent to stand trial." (*People v. Jones* (1991) 53 Cal.3d 1115, 1153; see also Pen. Code, § 1368.) It is only after the court

---

[3] The People note the applicable rule in their brief but -- like defendant -- do not apply it in their argument, instead arguing the issue in terms of substantial evidence.

has declared a doubt and suspended proceedings that the court must "appoint a psychiatrist or licensed psychologist, and any other expert the court may deem appropriate, to examine the defendant" (Pen. Code, § 1369, subd. (a)), unless "it is suspected the defendant is developmentally disabled," in which case "the court shall appoint the director of the regional center for the developmentally disabled . . . or the designee of the director, to examine the defendant" (*ibid.*).

Under the foregoing provisions, the duty to suspend proceedings and conduct a competency hearing is triggered by substantial evidence that a defendant is incompetent to stand trial -- regardless of the basis for that suspected incompetence. The basis for the defendant's suspected incompetence comes into play only after the court has ordered a competency hearing, and that basis affects only whether the court is required to appoint a psychiatrist or licensed psychologist to examine the defendant or instead is required to appoint the director of the regional center for the developmentally disabled or the director's designee.

Thus, the fundamental issue in each case is not what the basis is for the defendant's suspected incompetence -- a mental disorder or a developmental disability -- but rather whether the defendant is incompetent, whatever the basis of that incompetence may be. In light of this fact, the rule governing second competency hearings applies regardless of the fact that the renewed questioning of the defendant's competence rests on a different basis than the original questioning of his competence. In other words, a court's initial determination of competency is presumed correct, regardless of whether the suspected incompetence was based on a mental disorder or a developmental disability, and a second competency hearing is required only if: (1) there is evidence of a substantial change of circumstances; or (2) new evidence is presented that casts serious doubt on the validity of the prior finding of competence. (*People v. Weaver*, *supra*, 26 Cal.4th at p. 954.)

Here, defendant makes no attempt to show that Dr. Wicks's report and the results of the PET scan of his brain cast *serious doubt* on the determination of his competency that the trial court made in October 2011 based on Dr. Schaffer's two evaluations. While the PET scan results may well have provided a basis for believing that defendant was suffering from a developmental disability consisting of brain damage dating back to his youth,[4] defendant fails to explain how those results, even when read along with Dr. Wicks's report, cast serious doubt on the determination barely a year earlier that defendant was *competent to stand trial*. It is not enough for defendant to argue, as he does, that Dr. Wicks's "determination that [defendant] suffered from significant neurological impairment documented from an early age was sufficient to raise a doubt and most certainly a suspicion of a handicapping condition found to be closely related to intellectual disability that was of such a severe nature and affected [defendant]'s brain everywhere to such a degree that the deficiencies could not be compensated for." Instead, defendant needed to show how Dr. Wicks's conclusions, especially when considered in light of the PET scan results, cast serious doubt on the trial court's prior determination that defendant was competent to stand trial because he was was both able "to understand the nature of the criminal proceedings" and "to assist counsel in the conduct of a defense in a rational manner." (Pen. Code, § 1367, subd. (a).) Having failed to make any such showing, defendant has failed to overcome the " 'great deference' " we must give the trial court's ruling that a second competency hearing was not required here. (*People v. Weaver*, *supra*, 26 Cal.4th at p. 953.) Accordingly, we find no error in the court's refusal to suspend the proceedings and conduct a second hearing on defendant's competence to stand trial.

---

[4] We note that the only evidence of the PET scan results before the trial court at the time at issue here consisted of defense counsel's statements to the court regarding those results. For our purposes, however, we take those statements as an offer of proof.

9

## II

### *Juror Competence*

Defendant next contends the trial court erred in failing to conduct any inquiry after the jury foreperson reported that one of the jurors did not understand the reasonable doubt instruction. Again, we disagree.

"If at any time . . . a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, . . . the court may order the juror to be discharged . . . ." (Pen. Code, § 1089.) "Once a trial court is put on notice that good cause to discharge a juror may exist, it is the court's duty 'to make whatever inquiry is reasonably necessary' to determine whether the juror should be discharged." (*People v. Espinoza* (1992) 3 Cal.4th 806, 821.) "However, ' "not every incident involving a juror's conduct requires or warrants further investigation. 'The decision whether to investigate the possibility of juror bias, incompetence, or misconduct--like the ultimate decision to retain or discharge a juror--rests within the sound discretion of the trial court.' " [Citation.] " '[A] hearing is required only where the court possesses information which, if proven to be true, would constitute "good cause" to doubt a juror's ability to perform his duties and would justify his removal from the case.' " ' " (*People v. Cowan* (2010) 50 Cal.4th 401, 506.) Where the trial court "reasonably could have concluded that there were no grounds for believing good cause to excuse [a juror] might exist," it is not an abuse of discretion for the court to decline to hold a hearing or conduct a further inquiry. (*Id.* at pp. 507-508.)

Here, defendant suggests the trial court abused its discretion by not conducting a further inquiry because the court was "presented with evidence that a juror m[ight] be unable to deliberate." Not so. In fact, the jury foreperson told the court that the juror in question was, in fact, "participating" in deliberations.

To the extent defendant's argument rests on the concern that, although able to deliberate, the juror in question might have been unable to comprehend the jury

instructions, the statements by the jury foreperson were ambiguous as to what the problem actually was, and under the circumstances it was reasonable for the trial court to conclude that the problem was not, in fact, with the juror's ability to comprehend the jury instructions and thus perform her duties but was, instead, reflective of a disagreement over what constituted reasonable doubt. At first, the jury foreperson expressed concern with the juror's "literacy level." Ultimately, however, the court ascertained that the instructions had been read to the juror; thus, the juror's ability to read was not really the issue. And while the foreperson generally expressed doubt about whether the juror had "the comprehension to be able to read the instructions as given to her," the foreperson's only *specific* concern was about the juror's ability "to comprehend what 'reasonable' means and what 'beyond a reasonable doubt' means." Under these circumstances, it was not unreasonable for the trial court to conclude that the real problem was not with the juror's ability to read or with her ability to comprehend the instructions generally, but rather the problem lay in a disagreement among the jurors over what constituted reasonable doubt under the facts of the case.

Because, under these circumstances, the trial court reasonably could have concluded that there were no grounds for believing good cause to excuse the juror might exist, the trial court did not abuse its discretion in refusing to hold a hearing or conduct a further inquiry.

DISPOSITION

The judgment is affirmed.

_____ROBIE_____, Acting P. J.

We concur:


____MURRAY____, J.


____DUARTE____, J.

11